Lawrence J. HOLT et al., Petitioners,

v.

Robert SARVER, Commissioner of Corrections, State of Arkansas; John Haley, Payton Kolb, Marshall Rush, W. L. Currie, and William Lytle, Individually and in their capacities as Members of the Board of Corrections of the State of Arkansas, Respondents.

Travis Eugene FIELDS, Petitioner,

v.

Robert SARVER, Commissioner of Corrections, et al., Respondents.

George W. OVERTON, Petitioner,

v.

Robert SARVER, Commissioner of Corrections, et al., Respondents.

Stanley W. BROOKS et al., Petitioners,

v.

Robert SARVER, Commissioner of Corrections, et al., Respondents.

Jack Allen BARBER, Petitioner,

v.

Robert SARVER, Commissioner of Corrections, et al., Respondents.

Jerry DENHAM, Petitioner,

v.

Robert SARVER, Commissioner of Corrections, et al., Respondents.

Carlton J. CARNEY et al., Petitioners,

v.

Robert SARVER, Commissioner of Corrections, et al., Respondents.

Thomas Mitchell HILDERBRANDT, Petitioner,

v.

Robert SARVER, Commissioner of Corrections, et al., Respondents.

Nos. PB-69-C-24, 25, 29, 71, 75, 76, 80 and 91.

United States District Court, E. D. Arkansas, Pine Bluff Division.

Feb. 18, 1970.

Jack Holt, Jr., Philip Kaplan, Little
Rock, Ark., for petitioners.

Don Langston and Mike Wilson, Asst. Attys. Gen., State of Arkansas, for respondents.

Memorandum Opinion

HENLEY, Chief Judge.

These eight class actions have been brought by inmates of the Cummins Farm Unit of the Arkansas State Penitentiary System and the Tucker Intermediate Reformatory which is a part of that System against the members of the Arkansas State Board of Corrections and the State Commissioner of Corrections who administer the system. Plaintiffs contend on behalf of themselves and on behalf of other inmates and on behalf of other persons who may in the future be confined at Cummins or at Tucker that the forced, uncompensated farm labor exacted from Arkansas convicts for the benefit of the State is violative of the Thirteenth Amendment to the Constitution of the United States. They contend further that conditions and practices within the System are such that confinement there amounts to a cruel and unusual punishment proscribed by the Eighth Amendment to the Constitution of the United States, as carried forward into the Fourteenth Amendment. And they contend still further that unconstitutional racial segregation is being practiced within the System in violation of the Fourteenth Amendment. Federal jurisdiction is invoked under the provisions of 28 U.S.C. A. § 1343(3) and 42 U.S.C.A. § 1983.

It appearing to the Court that constitutional questions raised by the petitions submitted by the complaining inmates per sese were substantial, the Court appointed Messrs. Jack Holt, Jr. and Philip Kaplan of the Little Rock Bar to represent Petitioners without charge. Messrs. Holt and Kaplan accepted the appointments and have done yeoman service on behalf of their clients. The Court wishes to thank them for their efforts.

Petitioners' complaints are well summarized in Paragraph 20 of the Consolidated Amended and Substituted Complaint which is follows:

"20. The actions of defendants have deprived members of the plaintiff class of rights, privileges and immunities secured to them by the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States, including (a) the right not to be imprisoned without meaningful rehabilitative opportunities, (b) the right to be free from cruel and unusual punishment, (c) the right to be free from arbitrary and capricious denial of rehabilitation opportunities, (d) the right to minimal due process safeguards in decisions determining fundamental liberties, (e) the right to be fed, housed, and clothed so as not to be subjected to loss of health or life, (f) the right to unhampered access to counsel and the courts, (g) the right to be free from the abuses of fellow prisoners in all aspects of daily life, (h) the right to be free from racial segregation, (i) the right to be free from forced labor, and (j) the right to be free from the brutality of being guarded by fellow inmates."

The prayer is for a declaratory judgment to the effect that Respondents' acts, policies, and practices violate Thirteenth and Fourteenth Amendment rights and for appropriate permanent injunctive relief.

Shortly before the cases, hereinafter called collectively at times simply "the case" or "this case," were tried, Respondents, represented by Messrs. Don Langston and Mike Wilson of the Office of the Arkansas Attorney General, moved to dismiss the petitions on the ground that the case was nothing more than an effort to coerce the Arkansas Legislature into appropriating more money for the System, and that the Court was without jurisdiction to entertain such an action. The Court did not and does not so characterize the case, and the motion was denied. The Court is satisfied that it has jurisdiction un-

der the federal statutes heretofore cited, and so finds.

On the merits, Respondents do not contend that they are operating a "good" prison or a "modern" prison. With commendable candor they concede that many of the conditions existing at the Penitentiary are bad. However, they deny that they are operating an unconstitutional prison or are engaging in unconstitutional practices. They say that they are doing the best they can with extremely limited funds and personnel. They point, justly, to the fact that over the past several years a number of significant improvements have been made within the System and they say that more are in the offing.

This case, unlike earlier cases to be mentioned which have involved specific practices and abuses alleged to have been practiced upon Arkansas convicts, amounts to an attack on the System itself. As far as the Court is aware, this is the first time that convicts have attacked an entire penitentiary system in any court, either State or federal.

The cases were consolidated for purposes of trial and were tried to the Court without a jury for almost an entire week. Much testimony was taken and a substantial body of documentary evidence was introduced. The Court had the benefit of the expert testimony of a recognized authority on prisons and their administration, Mr. James V. Bennett who for many years was Director of the Federal Bureau of Prisons. The Court had indirectly the benefit of the views of Mr. Austin McCormick of New York City, another recognized penologist, who is Executive Director of the Osborne Association, Inc., and who served as Chief Consultant to the Penitentiary Study Commission created by the Arkansas Legislature in 1967. (Act 22 of 1967, approved January 31, 1967.) The views of Mr. McCormick are set forth in the formal report of the Commission submitted on January 1, 1968, a copy of which report was introduced in evidence. There has also been made available to the Court a copy of a report

in letter form from Dr. Charles M. Friel, Director of Research, Institute of Contemporary Corrections and the Behavioral Sciences, Sam Houston State University, Huntsville, Texas, to the Arkansas Commission on Crime and Law Enforcement. That report is dated January 29, 1970, which date was the third day of the trial of this case. While the report was not formally introduced in evidence, it will be made part of the record, and the Court feels at liberty to consider it.

Apart from the foregoing, the Court heard the testimony of inmates and free world employees of the Penitentiary System; the Court also saw a motion picture film depicting certain prison conditions and has examined a number of photographs and other documentary material.

This Memorandum incorporates the Court's findings of fact and conclusions of law. In view of the serious nature of the case, in view of the fact that in a sense the real Respondents are not limited to those formally before the Court but include the Governor of Arkansas, the Arkansas Legislature, and ultimately the people of the State as a whole, the issues presented have been given the most careful consideration of which the Court has felt itself capable. The questions presented are grave and will be discussed fully. The Court deems it well, however, to state in advance of discussion its ultimate findings and conclusions on the constitutional issues presented.

1. The Court rejects the contention of the Petitioners that the forced, uncompensated labor of Arkansas convicts violates the Thirteenth Amendment.

2. The Court sustains the claim that conditions and practices in the Penitentiary System are such that confinement of persons therein amounts to a cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments.

■ 3. The Court sustains the claim that to the extent that unconstitutional racial discrimination is being practiced in the System it must be eliminated.

Having so stated its findings and conclusions, the Court will proceed to discuss them and thereafter will pass to a consideration of the relief to be awarded.

## I. *Introduction*

The Arkansas State Penitentiary System consists of the 16,000 acre Cummins Farm located in Lincoln County; the Tucker Intermediate Reformatory located on a 4,500 acre farm in Jefferson County; and the small Women's Reformatory located on the Cummins Farm.[1]

The inmate population at Cummins now consists of somewhat less than 1,000 persons; about 325 persons most of whom are under 21 years of age are confined at Tucker. Prior to the passage of Act 377 of 1969 the Tucker Intermediate Reformatory was known simply as the Tucker Farm Unit of the Arkansas State Penitentiary. It is a much smaller institution than Cummins and its problems and those of its inmates are not nearly as severe as those existing at Cummins. For that reason discussion will be directed chiefly at Cummins, and references to the "Penitentiary" will in general be references to Cummins. Specific mention of Tucker will be made where such mention appears necessary or desirable.

The report of the Penitentiary Study Commission to which reference has been made contains as its second section a historical account of the Arkansas penal system prepared originally at some unspecified time by John L. Ferguson, State Historian, and covering the period from 1838 to 1933.

Arkansas was admitted to the Union in 1836. In 1838 the Legislature authorized the construction of a "Jail and Penitentiary," and in 1840 such an institution was constructed in the City of Little Rock. It was a jail type structure located on the present site of the Arkansas State Capitol. When it was decided to build the Capitol on its present site, the Penitentiary was moved to another location in the southwestern part of the City and became known as the Penitentiary Walls.

In 1902 the State purchased the Lincoln County lands that became Cummins Farm; some years later the smaller Tucker Farm was acquired. In 1933, due at least in part to financial stringencies imposed by the Depression, the Walls were abandoned as far as prison use ·was concerned, and the entire penitentiary operation was transferred to the farms. While Cummins has customarily been the headquarters of the Penitentiary System, the electric chair for executions was installed at Tucker and the cells for condemned men were located at Tucker.

Tucker was designed primarily for the confinement of young white convicts and for the confinement of both whites and Negroes awaiting execution. Negro convicts, other than those condemned to die, were confined at Cummins, and Cummins was also used as a place of confinement for more hardened white convicts.

Prior to the Civil War Arkansas convicts were leased to private employers and were frequently mistreated seriously by the lessees. There was strong public opposition to the system for both humanitarian and economic reasons and it was abolished in 1913. Since that time Arkansas convicts have been required to work for the State, and their work has consisted largely of agricultural and other manual labor for which they are paid nothing either actually or constructively.

At both Cummins and Tucker the inmate population is divided into three categories. At the bottom of the list are

---

1. All of the Petitioners in this case are men. However, the Court heard some evidence about the Women's Reformatory. That institution houses about 35 inmates; not all of them are felons; some are simply chronic alcoholics.

ordinary laboring convicts known as "rankers." At the top of the list are privileged inmates known as "trusties." Between those two categories is a third class of convicts known as "do pops;" how they came to be so called is not clear.

As indicated, most of the inmates at Tucker are young men who are not, in general, a particularly vicious lot, although there are exceptions. The Cummins population is extremely varied. Some are run-of-the-mill non-violent criminals; others are extremely violent and dangerous; many are incorrigibles; some are properly classified as either sociopathic or psychopathic, if not psychotic. A few of them have to be kept in isolation cells for 24 hours a day to protect them from other inmates or to protect other inmates from them.

Certain characteristics of the Arkansas prison system serve to distinguish it from most other penal institutions in this country. First, it has very few paid employees; armed trusties guard rank and file inmates and trusties perform other tasks usually and more properly performed by civilian or "free world" personnel. Second, convicts not in isolation are confined when not working, and are required to sleep at night in open dormitory type barracks in which rows of beds are arranged side by side; there are large numbers of men in each barracks. Third, there is no meaningful program of rehabilitation whatever at Cummins; while there is a promising and helpful program at Tucker, it is still minimal.

Prior to about 1965 the people of Arkansas as a whole knew little or nothing about their penal system although there were sporadic and sensational "exposes" from time to time about alleged conditions at the farms.

Those "exposes" created little, if any, lasting impressions on the Arkansas public. As of that time it is probably fair to say that many otherwise well informed Arkansas people viewed the Penitentiary as a self-sustaining even profit-making institution, operated by a few strong willed men who were able to make the convicts behave themselves and work; while it was recognized that the life of the convicts was probably hard, that was as it should be; they had been sent to the Penitentiary to be punished and were not entitled to lead a "country club" existence. Reports of whippings might cause passing concern which was easily allayed by the thought that the convicts who were whipped deserved to be whipped, and that a man who went down to the Penitentiary and behaved himself and did his work would be treated fairly and would get along fairly well.

That popular impression of the Penitentiary was not accurate in former years, and to the extent that it is still present it is not accurate today, as will be seen presently. However, the myth tends to be preserved by glowing reports of members of conducted tours of the farms who are shown in daylight hours what their conductors want them to see, who talk to selected convicts, and who are fed a good meal accompanied by the assurance that they are eating "just what the inmates eat."

In 1961 the Supreme Court of the United States handed down its landmark decision in the case of Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492, holding that old section 1979 of the Revised Statutes, derived from section 1 of the "Ku Klux Act" of 1871, and which became 42 U.S.C.A. § 1983, gave to individual citizens a viable remedy in the federal courts for deprivations of federally protected rights by persons acting under color of law.[2]

By 1965 Arkansas convicts were becoming more articulate about the conditions under which they lived than in years past and were having more success in bringing their complaints to the attention of free world authorities, includ-

---

2. While Monroe v. Pape involved police officers who had unlawfully searched a private dwelling, its applicability to convicts and their keepers was obvious.

ing the federal courts sitting in this State.

In that year litigation about Penitentiary conditions began in this Court and has continued here and in the Court of Appeals ever since. The litigation has up to this time produced three published opinions of the District Court and two opinions of the Court of Appeals. Arranged chronologically, those opinions are: Talley v. Stephens, E.D.Ark., 247 F.Supp. 683, opinion by this writer; Jackson v. Bishop, E.D.Ark., 268 F. Supp. 804, joint opinion of Judges Gordon E. Young and Oren Harris, reversed in part, 8 Cir., 404 F.2d 571; Courtney v. Bishop, 8 Cir., 409 F.2d 1185; Holt v. Sarver, E.D.Ark., 300 F.Supp. 825, opinion by this writer and hereinafter called *Holt I*.[3]

In all of those cases, except *Courtney*, it was found that unconstitutional practices were being carried on at the Penitentiary, and injunctive relief was granted. The final result of the Talley and Jackson cases was that corporal punishment of inmates, practiced for years at the farms, was outlawed along with the use of such devices of torture as the "Tucker Telephone" and the "teeter board." In *Holt I* this Court held that the State owed a constitutional duty to inmates at Cummins to use ordinary care for their safety, and that the State

had failed and was failing to discharge that duty; the Court also found that due to overcrowding confinement in the Cummins isolation cells was unconstitutional.

The decree entered in *Holt I* in the summer of 1969 brought about some improvements in conditions at Cummins, notably what appears to be an elimination of gross overcrowding in the isolation cells. However, continuing complaints from inmates of both Cummins and Tucker and disturbing information that financial difficulties might have caused a retrogression to former conditions to set in prompted the Court not to approve the report of the Commissioner filed in *Holt I* and to give further consideration to overall conditions at both institutions.

Aside from the litigation just outlined, there have been significant recent developments at the farms. In the late summer of 1966 serious trouble with inmates broke out that led to a full investigation of conditions at both farms by the Arkansas State Police and by the Federal Bureau of Investigation. That investigation plus an additional investigation brought about by another violent episode at Cummins in October 1968 produced certain prosecutions in the Circuit Court of Jefferson County, Arkansas, and in this Court.[4]

---

3. *Holt I* was actually three cases which were consolidated for purposes of trial and were tried in 1969. Those cases were never actually terminated, and they are presently before the Court along with five additional cases which the Court permitted to be commenced and prosecuted.

4. Following the 1966 investigation certain former employees at the Tucker Farm were charged in the Circuit Court of Jefferson County, Arkansas, with having violated Ark.Stats. § 46–158 which made it a felony for any Penitentiary employee to inflict a punishment on a convict in excess of the punishment prescribed by the then Penitentiary Board. The Circuit Court held that the Arkansas statute was violative of the Arkansas Constitution in that it involved an invalid delegation of legislative power to the Board. The informations were dismissed by the

Circuit Court, and the Supreme Court of Arkansas affirmed. State v. Bruton, 246 Ark. 288, 437 S.W.2d 795.

In 1968 a number of prisoners at Cummins went on a sit down strike and refused to disperse. They were fired upon with shotguns loaded with birdshot by a number of free world people and trusty guards. Some inmates were wounded, one seriously. Fortunately, no one was killed.

The abortion of the State court prosecutions and the 1968 episode just described caused the United States Department of Justice to ask the Court to call the federal Grand Jury for the Eastern District of Arkansas into special session in the summer of 1969. That was done, and a number of indictments were returned against Penitentiary employees and former employees and against a number of former inmates charging violations of 18 U.S.C.A. § 242. The Court conducted

When the Legislature convened in January 1967 it promptly created the Penitentiary Study Commission. The Emergency Clause included in Act 22 of 1967 creating the Commission and directing it to make a detailed study of the farms recited that widespread publicity about the Penitentiary had "raised serious questions in the minds of public officials and the general public regarding the facilities, practices, and disciplinary procedures at the State Penitentiary and that it is necessary that a thorough study and evaluation of the penal system in Arkansas be made as soon as possible."

The Commission's study was detailed, and its report was sharply critical of many aspects of the prison system; numerous reforms were recommended. Responding to the report, the Legislature in special session in early 1968 adopted Act 50 of that year, a sweeping statute dealing with the prison system and which recognized that training and rehabilitation should be essential objectives of the farms. That Act, among other things, created the Department of Corrections which took the place of the old Penitentiary Board.

The legislation adopted in 1967 and 1968 and Act 377 of 1969 establishing the Tucker Intermediate Reformatory are forward looking; but at least as yet they have not had any significant impact on the distinctive characteristics of the Arkansas penal system mentioned heretofore.

Returning now to this case, the testimony of Director Bennett, the report of the Study Commission, and the 1969 report of Dr. Friel to the Commission on Crime and Law Enforcement, are all to the effect that the Arkansas Penitentiary System is substandard and outmoded when measured by accepted penological standards, and that improvements are needed in many areas. Commissioner

Sarver himself has come forward with sweeping recommendations for radical improvements to be made over a period of about ten years.

■■ The Court, however, is limited in its inquiry to the question of whether or not the constitutional rights of inmates are being invaded and with whether the Penitentiary itself is unconstitutional. The Court is not judicially concerned with questions which in the last analysis are addressed to legislative and administrative judgment. A practice that may be bad from the standpoint of penology may not necessarily be forbidden by the Constitution. And a prison system that would be excellent from the point of view of a modern prison administrator may not be required by the provisions of the Constitution with which the Court is concerned.

## II. *The Thirteenth Amendment Claim*

The Court takes up first the Thirteenth Amendment contention of Petitioners. Some facts relevant to that claim have been stated already; other facts to be stated are relevant not only to the Thirteenth Amendment claim but also to Petitioners' claims based on the Fourteenth Amendment.

The Thirteenth Amendment, adopted immediately after the Civil War, provides explicitly that:

"Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."

■ The purpose of the Amendment was, of course, to abolish African slavery and practices related or analogous thereto. It will be observed that the Thirteenth Amendment, unlike the Fourteenth and certain other Amendments, is more than a prohibition upon the States.

a number of jury trials which with one exception resulted in verdicts of not guilty, although the evidence in all of the cases was ample to convict. In one case the jury was not able to agree. As to

that case the defendant ultimately pleaded nolo contendere, and another plea of nolo contendere was entered by another defendant.

The Thirteenth Amendment abolishes slavery and involuntary servitude, except as punishment for crime, everywhere in the United States, its Territories, and possessions.

The Thirteenth Amendment claim with which the Court is concerned relates primarily to the requirement that Arkansas convicts work for long hours without pay in the fields on the farms for the financial benefit of the State. Not all rank and file Arkansas convicts are required to perform labor of that type, but substantial numbers of them are. As in other contexts, the principal problem is at Cummins. That is true because the farming operation now being conducted at Tucker is limited to the production of food for inmate consumption. Tucker farmlands not used for that purpose have been leased to private operators.

Cummins Farm is located on fertile land well adapted to producing just about any kind of crop that can be grown in Arkansas. The principal crops produced on the farm are cotton, soybeans, rice, vegetables, fruits, and berries. Other substantial farm operations include livestock, dairying, and poultry production.

According to the report of the Study Commission, there were 9,070 acres of land in cultivation at Cummins as of December 15, 1967. As of the same date the Farm had 2,070 cattle, 800 hogs, 40 horses, 160 mules, and 1,600 poultry.

Again according to the Commission, during 1967 60 percent of the cultivated acreage at Cummins was devoted to crops raised for sale on the market; 30 percent to crops that supported the livestock and poultry; and 10 percent to garden vegetables and other crops for the feeding of civilian personnel and inmates.

The Commission's report reflects that with respect to the fiscal year ending June 30, 1966, the Penitentiary, both farms apparently, derived an income of $1,415,419.43 from the sale of crops, including field crops, vegetables, fruit, and pecans; the corresponding figure for the year ending June 30, 1967, was $1,-242,191.38. Sales of farm products other than crops amounted to $213,561.22 for fiscal '66 and to $131,806.13 for fiscal '67.

Total receipts of the Penitentiary from all sources for fiscal '66 was $1,-763,487.09 and total expenditures came to $1,473,497.70. Corresponding figures for fiscal '67 were $1,566,712.76 and $1,785,570.33.

The December 15, 1967, inventory of equipment at Cummins, appearing at page 6.09 of the Commission's report, indicates that there has been substantial mechanization of the Farm's operation. However, the evidence reflects that much of the work is still done by hand, and the fact that in 1967 the Farm owned 160 mules indicates that a good deal of power utilized at the Farm is "mule power."

In 1967 the Farm had a cotton allotment of 962 acres worked largely by hand, and the production of fruits and vegetables involves a great deal of what is commonly called "stooped labor."

Men assigned to the fields are required to work long hours six days a week, except for a few holidays, if weather permits. They are worked regardless of heat, and summers can be very hot at Cummins; in the winter they are not required to work when the temperature is below freezing, but they are required to work in merely bad or wet weather regardless of the season of the year. The men are not supplied by the State with particularly warm clothing for winter work, nor are they furnished any bad weather gear. There is evidence that at times men have been sent to the fields without shoes or with inadequate shoes. The field work is arduous and is particularly onerous in the case of men who have had no previous experience in chopping and picking cotton or in harvesting vegetables, fruits, and berries. What skills they may acquire in connection with their field work are of very little, if any, value to them when they return to the free world.

Naturally, the inmates do not like to work in the fields. Prior to the decision of the Court of Appeals in *Jackson*, supra, most of them could be forced to do so by applications of the strap. Now there is no sanction, except confinement in isolation, to compel the men to work, and many of them are willing to undergo solitary confinement in order to avoid field work.

Rankers assigned to work in the fields do so in groups known as "long lines." The numbers of men in long lines may vary considerably. Theoretically, each long line is under the supervision of a free world employee known as a field warden. Actually, the rankers are under the immediate and direct supervision of trusties known as "long line riders" and inmate "pushers." As his name implies, the long line rider is a mounted man who rides back and forth among the working men. Since he is in very close proximity to the rankers and is somewhat vulnerable to attack from them, he ordinarily does not carry a firearm, although he may do so on occasions. The real guarding of the rankers in the field is done by other trusties armed either with high powered rifles and known as "high powers," or with shotguns and known, logically, as "shotguns."

According to the Study Commission's report, a long line at Cummins on a typical date might be made up of, say, 56 rankers, nine trusty guards, and a long line rider. The perimeter of the plot in which the rankers are working is occupied by guards armed with rifles; guards armed with shotguns work in closer proximity to the rankers.

If a ranker tries to escape, the trusties are instructed to fire one warning shot into the air; if the ranker persists in his effort to get away, the trusties fire at him to "stop" him; it makes no difference whether he is killed or not. Whether a ranker is trying to escape is at times subject to question, and the question is answered summarily by the guards. Thus, a ranker who unwittingly strays across an imaginary deadline may be fired upon. In addition to running the risk of being shot by an over-zealous guard or by one with merely poor judgment there is always the possibility that a guard will deliberately murder an inmate on the pretense that he was trying to escape.

As stated, the men are paid nothing for their work. If an inmate wants to earn money legitimately in his spare time while in the Penitentiary, there are only two ways in which he can do it. The inmates as a class are permitted to have an Inmate Welfare Fund which operates a commissary type store and which also operates a blood bank. Profits from the store and the blood bank inure to the Fund which, parenthetically, appears as of this moment to have more money available to it than Respondents have available to them to run the Penitentiary. A very limited number of inmates are employed in the store and are paid small monthly salaries. Other inmates can sell their blood once a week at the blood bank and receive $5 per visit. The inmates refer to selling their blood as "bleeding at the blood bank." However, not all inmates are permitted to "bleed" and, hence, cannot earn the $5; for example, the bank will not accept blood from an inmate with a morbid condition of the liver.

What small comforts and luxuries the inmates have legitimately are not furnished by the State but by the Welfare Fund, and it is the Fund, not the State, that gives a departing inmate the nominal sum of $25 to see him on his way.

Director Bennett testified that inmates of federal prisons and of many State prisons can earn legitimate although usually very low wages while confined. He thinks that such wage payments are desirable for several reasons: they give a man an incentive to work; they improve his morale; they enable him to be of some assistance to his dependents; and they perhaps enable him to build up a small stake for himself against the day on which he is to be released from prison. Mr. Bennett conceded, however, that there are still some

States, like Arkansas, that pay their convicts nothing.

The picture of working conditions at Cummins that has been painted is not attractive, and the system would not be called humane by modern standards. But, the question for decision at this moment is whether the system is prohibited by the Thirteenth Amendment.

■ The Arkansas system of working convicts is not "slavery" in the constitutional sense of the term. The State does not claim to own the bodies of its prisoners. The situation does involve "servitude," and there is no doubt whatever that the "servitude" is "involuntary."

But, it is equally clear that this servitude has been imposed as punishment for crimes whereof the inmates have been duly convicted. Conceding that the work required is hard and tedious, that it is performed under harsh conditions, that the State requires it to produce income for the State, and that the system serves little other purpose, if any, the Court is not persuaded that the system violates the Thirteenth Amendment.

According to Director Bennett, the idea that prisons and prisoners ought to support themselves is as old as American penology. He referred to the fact that the convict-leasing system came into existence at a very early stage as the States found that it was more profitable to lease their convicts than to work them themselves. And he pointed out that one of the best descriptions of the leasing system is to be found in Margaret Mitchell's Civil War novel, "Gone With The Wind."

When Congress submitted the Thirteenth Amendment to the States, it must have been aware of generally accepted convict labor policies and practices, and the Court is persuaded that the Amendment's exception manifested a Congressional intent not to reach such policies and practices.

Heflin v. Sanford, 5 Cir., 142 F.2d 798, is instructive on this phase of the case although it did not involve convict labor. Heflin, a conscientious objector, was ordered to report for work of national importance during World War II; his compensation would have been but nominal. He refused to report and was sent to the penitentiary for violating the Selective Service Act. On habeas corpus he contended that to require him to do work of national importance with little or no pay amounted to prohibited slavery and involuntary servitude. His contention was rejected. The Court pointed out that there is a difference between "involuntary servitude" and "uncompensated service," and that the Thirteenth Amendment prohibits the one, except as punishment for crime, but does not prohibit the other.

III. *Fourteenth Amendment Claim— Cruel and Unusual Punishment.*

The Eighth Amendment to the Constitution of the United States prohibits the infliction of "cruel and unusual punishments." Originally a restriction on the federal government, it has been held that the Eighth Amendment has been carried forward into the Fourteenth Amendment, Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758, and it was on the basis of the Eighth Amendment that relief was granted in *Talley, Jackson,* and *Holt I,* all supra.

An individual convict may, of course, be subjected to a cruel and unusual punishment actually inflicted on him personally, as by his being beaten with the Penitentiary strap, or by being shocked electrically by the Tucker Telephone, or by being compelled to stand upon the "teeter board" for long periods of time, or by other means of punishment or torture.

■ It appears to the Court, however, that the concept of "cruel and unusual punishment" is not limited to instances in which a particular inmate is subjected to a punishment directed at him as an individual. In the Court's estimation confinement itself within a given institution may amount to a cruel and unusual punishment prohibited by the Constitution where the confinement

is characterized by conditions and practices so bad as to be shocking to the conscience of reasonably civilized people even though a particular inmate may never personally be subject to any disciplinary action. To put it another way, while confinement, even at hard labor and without compensation, is not considered to be necessarily a cruel and unusual punishment it may be so in certain circumstances and by reason of the conditions of the confinement. That is certainly the law in the case of prisoners confined in isolation, Courtney v. Bishop, supra, *Holt I*, supra, and cases there cited; and the Court sees no reason why it is not the law in cases of prisoners confined "in population," as it is called.

In the instant case Petitioners contend that overall conditions in the Arkansas penal system, including but not limited to those relating to inmate safety, may be so bad that it amounts to an unconstitutional cruel and unusual punishment to expose men to those conditions, regardless of how those conditions may operate fortuitously on particular individuals. Is that contention sustained by the evidence?

The distinguishing aspects of Arkansas penitentiary life must be considered together. One cannot consider separately a trusty system, a system in which men are confined together in large numbers in open barracks, bad conditions in the isolation cells, or an absence of a meaningful program of rehabilitation. All of those things exist in combination; each affects the other; and taken together they have a cumulative impact on the inmates regardless of their status. That should be borne in mind as one reads the following descriptions of the trusty system, the barracks system, the isolation cells, and other aspects of prison life.

Again, these descriptions are based primarily on conditions at Cummins. They are based on a large volume of testimony much of which was really a repetition of what the Court heard when it tried *Holt I*.

*The Trusty System.*

No one questions the propriety or desirability of according trusty status to deserving convicts, and perhaps all prisons do. But the trusty system as it exists in Arkansas is *sui generis*. The trusties run the prison. They not only guard other inmates; they also perform many administrative tasks normally performed by free world people, and their authority over other convicts of lesser rank is great. Commissioner Sarver testified without contradiction that more than 90 percent of prison functions relating to inmates are performed by trusties. The few free world people are only nominally in command of the situation at Cummins, and the trusties could take it over in a moment. Perhaps the reason they do not do so is that they do not want to spoil a good thing.

The extent of Arkansas' reliance on trusties is apparent when it is realized that there are only 35 free world employees at Cummins in ostensible charge of slightly less than 1,000 men. Of those 35 only eight are available for guard duty, and only two of them are on duty at night.

The use of trusty guards is universally condemned by penologists, and the system is now in use only in Arkansas, Louisiana, and Mississippi. According to Director Bennett, the reliance that Louisiana places upon trusty guards is much less than that which exists in Arkansas. He did not testify with respect to Mississippi. The reasons for penological disapproval of the use of trusty guards are that it creates an unhealthy prison climate and atmosphere; it breeds fear and hatred between the guards, on the one hand, and those guarded, on the other hand; it tends to be brutal and to endanger the lives of inmates who live and work "under the guns" of other convicts; and it leads to other abuses.

In this connection it may be observed that some inmates of the Penitentiary have refused to accept trusty guard status due to their feeling that it is

"wrong" for one convict to guard another and to their fear of what might happen to them should they ever be demoted to the ranks. And Mr. Bennett testified that when he was head of the Bureau of Prisons, it was frequently necessary to take strong protective measures with respect to inmates of federal prisons who had formerly been trusty guards in Arkansas.

Apart from the use of trusties as guards, they can be given too much authority in other areas of prison life. When that is done, various abuses come into existence. When all is said and done, the fact remains that a trusty is a convict, and many trusties will on occasions act like felons and thieves. They will take bribes, they will engage in extortion, they will smuggle contraband, and they will connive at violations of prison rules. Opportunity for abuse is particularly present where, as in Arkansas, trusties have access to prison records pertaining to themselves and to other inmates. A trusty with such access can remove damaging material, such as a detainer, from an inmate's file; he can insert improper material; or he can impart to other inmates confidential information that ought not to be imparted. The undesirability of having prison telephone communications with the outside world in the control of trusties, as it is in Arkansas, is too obvious to require description.

This does not mean that trusties should never be given responsible jobs. One of the chief functions of rehabilitation is to teach convicts to assume and discharge responsibilities. But, it does mean that the areas of trusty responsibility should be limited, and that the trusties, both individually and as a body, should be under the full control and adequate supervision of free world people.

The danger of excessive reliance on trusties was discussed fully in the report of the Study Commission, and one of the recommendations of the Commission was that the system be retained "insofar as it conforms to the type found in the better American state and federal prisons,"

but that "trusties no longer be given duties, responsibilities or authority that should be given only to civilian employees who can be held legally responsible."

As the Court's description of the trusty system in Arkansas proceeds, it will be seen, to the extent that it has not become apparent already, that just about every abuse which the system is capable of producing has been produced and is being practiced in this State.

An inmate gets to be a trusty in Arkansas by promotion from the ranks or from "do pop" status. While promotions and demotions are formally made by committees of free world personnel, as a practical matter such actions are usually based uncritically on initial recommendations of trusties. In the case of a field worker, the recommendation is usually made by a long line rider.

Actually, few, if any, objective criteria are used in selecting trusties; that a man is a bad man, or a dangerous man, or that he has a bad criminal record is by no means a disqualification; on the contrary, it may be a recommendation. In the case of a trusty guard probably the principal criterion of promotion is his willingness to prevent escapes and support the free world people vis a vis the general inmate population, shooting to kill if necessary to achieve those objectives. A trusty is not expected to take any steps to protect an inmate from violence at the hands of another inmate, and the trusties do not do so.

In a very real sense trusty guards have the power of life and death over other inmates. Some guards are doubtless men of some judgment and humanity; others are not. It is within the power of a trusty guard to murder another inmate with practical impunity, and the danger that such will be done is always clear and present. Very recently a gate guard killed another inmate "carelessly." One wonders. And there is evidence that recently a guard on night duty fired a shotgun into a crowded barracks because the inmates would not turn off their television set. In any

event, the rankers live in deadly fear of the guards and entertain deadly hatred for them, and their feelings are reciprocated fully.

The Study Commission recommended that the guard system be phased out as soon as possible, starting with the trusties guarding field workers. The Court thinks that that is a good recommendation, but the trusty guard system itself, bad as it is, does not give the Court as much trouble as do other facets of the overall trusty system.

By virtue of their positions of authority and the functions they perform trusties can make or break rankers and "do pops." They can make prison life tolerable or they can make it unbearably hard. They can and do sell favors, easy jobs, and coveted positions; they can and do extort money from inmates on any and all pretexts. They operate rackets within the prison, involving among other things the forcing of inmates to buy from them things like coffee at exorbitant prices. They lend money to rankers and then use force or threats of force to collect the debts.

Controlling the slaughter house, the kitchen, and the prison stores, trusties steal food and other commodities from the institution and then sell them to other inmates. An inmate can eat well at the Penitentiary if he can pay for what he gets; if he cannot pay, he eats as regular issue what the trusties have seen fit to leave.

Trusties have rather broad privileges about leaving the farms. Coming back they bring with them weapons, liquor, and drugs which they sell to less privileged inmates. As might be expected liquor is much in demand, and its price is high. A pint of taxpaid whiskey sells for $10, much more than twice its free world price.

When a new inmate arrives at the Penitentiary, about the first person to interview him is a trusty who frequently starts out to relieve him by threats or promises of what money and property he may possess.

An enterprising trusty who makes the most of his opportunities can do quite well for himself. Some do so well that they do not want to leave the institution. While it can hardly be said that the trusty system in Arkansas is a "free" enterprise system, it is certainly a capitalistic system with some of the worst features commonly attributed to "Mafia" techniques in organized crime.

One of the worst features of the system is that the trusties form a living barrier between ordinary inmates and institutional facilities and services that are available and to which an inmate ought to be able to have access as a matter of course. If a ranker can pay or is on good terms with the trusties, he can get what he needs when he needs it; he can get to the infirmary when the doctor is there; he can get prescribed medications. If he cannot pay or does not get along with the trusties, the case is far otherwise.

Additionally, inmate access to free world personnel too often depends on trusty good will, whim, or caprice. This Court has long been convinced that many of the complaints that it receives from inmates stem from a simple lack of communication between the complainants and civilian personnel, the lack being due to trusty interference or indifference.

Not only can the trusties prevent a ranker from getting into contact with a civilian employee; they can and frequently do bring unmerited discipline down on the head of a ranker by "writing him up" for unsatisfactory work or for refusal to work; their reports are frequently, if not usually, taken at face value by the employees to whom they are made.

In fairness to the trusties it should perhaps be said that their roses are not without thorns. Just as a trusty can make or break a ranker, so can he be broken or demoted by a superior trusty or by free world personnel. And if he is demoted to the ranks, he is at the tender mercy of those whom he may have per-

secuted or exploited, and it may become necessary to put him in isolation for his own protection.

Before leaving its description of the trusty system, the Court will say that it has not overlooked the fact that many of the abuses practiced by trusties could also be practiced by free world personnel, but the Court thinks that free world people, carefully selected and properly paid, would be far less likely to commit such abuses than are the felons now holding positions of authority.

*Life In The Barracks.*

The report of the Study Commission reflects that there are eight barracks at Cummins and three at Tucker. Only five of the barracks at Cummins appear to be in use at the present time perhaps due to the fact that the population of Cummins is lower now than it has been in years past. White trusties occupy one barracks; Negro trusties occupy another barracks; white rankers have a barracks of their own; and Negro rankers have a barracks of their own. At the present time "do pops" at Cummins have their own barracks; the record does not disclose whether there are any Negro "do pops." The Commission's report indicates that when "do pops" are not sleeping in their own barracks, they are housed with rankers.

A barracks is nothing more than a large dormitory surrounded by bars; the barracks are separated from each other by wide hallways, and the complex of hallways is referred to as the "yard." At the present time the barracks house more than 100 men each assigned without regard to anything but rank and race. The inhabitants of a given barracks have free access to each other at all times. Only two free world people are on duty in the yard at night. Inmate "floor walkers" are stationed inside the barracks proper for the purpose of keeping order and reporting disturbances. In their barracks the trusties are not armed except with their own knives which they continually keep at hand; however, there are probably one or more armed trusties in picket posts within the barracks building.

In *Holt I* the Court discussed life in the Cummins barracks in some detail; it was said (pp. 830–831 of 300 F.Supp.):

"Prisoners who are not confined in the isolation unit sleep in open barracks. There are two barracks for trusties and two for 'dopops' and rankers. Those barracks amount to enclosed dormitories in which the inmates sleep on cots arranged in rows. At night there are one or more free world guards on duty outside the barracks proper, but they are not actually inside the sleeping area. Those areas are supposedly patrolled by inmate 'floorwalkers' whose duty it is to report disturbances to the guards.

"Since the inmates sleep together in the barracks, an inmate has ready access to any other inmate sleeping in the same barracks. Many of the inmates have weapons of one sort or another, and the evidence indicates that in spite of efforts to do so it is impossible from a practical standpoint to prevent inmates from having small weapons such as knives or scissors in their possession.

"At times deadly feuds arise between particular inmates, and if one of them can catch his enemy asleep it is easy to crawl over and stab him. Inmates who commit such assaults are known as 'crawlers' and 'creepers,' and other inmates live in fear of them. The Court finds that the 'floorwalkers' are ineffective in preventing such assaults; they are either afraid to call the guards or, in instances, may be in league with the assailants.

"The undisputed evidence is to the effect that within the last 18 months there have been 17 stabbings at Cummins, all but one of them taking place in the barracks, and four of them producing fatal results. At least two of the petitioners now in isolation have been assailants in stabbing inci-

dents and others have been the victims of such incidents.

"Respondent and his subordinates deplore the situation just described but insist that until the maximum security unit can be put into use there is nothing that they can do about it. Respondent testified that when he was the head of a penitentiary in another State convicts there slept in individual cells and there were 170 paid guards; he also testified that the incidence of stabbings at Cummins was no higher than that at the other institution he had headed. He conceded, however, that more free world guards at Cummins might ameliorate the situation somewhat.

"The Court recognizes, of course, that assaults, fights, stabbings, and killings may and do occur in penal institutions that are unquestionably well equipped, well staffed, and well managed. It occurs to the Court, however, that such incidents in such institutions take place in spite of all reasonable precautions taken by prison authorities. At Cummins there are no precautions worthy of the name, and the 'creepers' and 'crawlers' take deadly advantage of that fact.

"The Court is of the view that if the State of Arkansas chooses to confine penitentiary inmates in barracks with other inmates, they ought at least to be able to fall asleep at night without fear of having their throats cut before morning, and that the State has failed to discharge a constitutional duty in failing to take steps to enable them to do so."

Conditions in those barracks have not changed significantly since *Holt I* was decided, except that there has been a decline in the rate of stabbings. There is, however, something more to be said about the barracks in the light of the evidence produced in this case.

The Court heard much testimony about homosexuality in the barracks and elsewhere at Cummins. Homosexuality probably is practiced in all prisons in the United States, and there is a great deal of it practiced at Cummins, some consensual, a great deal nonconsensual. An inmate who is physically attractive to other men may be, and frequently is, raped in the barracks by other inmates. No one comes to his assistance; the floor walkers do not interfere; the trusties look on with indifference or satisfaction; the two free world people on duty appear to be helpless.

Inmates who are passively homosexual are called "punks." There are varieties of "punks," including the "pressure punks" who will engage in homosexual acts if more or less pressure is put upon them to induce or compel them to do so.

In an effort to protect young men from sexual assaults, they are generally assigned to the two rows of cots nearest the front bars of the barracks, which portion of the barracks is called "punk row." It appears, however, that if would-be assailants really want a young man, his being assigned to the "row" is no real protection to him.

To the extent that consensual homosexual acts take place in the barracks, they are not carried out in any kind of privacy but in the full sight and hearing of all of the other inmates.

Sexual assaults, fights, and stabbings in the barracks put some inmates in such fear that it is not unusual for them to come to the front of the barracks and cling to the bars all night. That practice, which is of doubtful value is called "coming to the bars" or "grabbing the bars." Clearly, a man who has clung to the bars all night is in poor condition to work the next day.

Conditions in the barracks are worsened by the prevalent consumption of liquor and beer and by the use of drugs. It is not uncommon for many, if not all, of the inmates of a particular barracks to become intoxicated by drugs and alcohol all at the same time. The resulting commotion, violence, and confusion are quite imaginable. The free world people cannot control the situation; the trusties will not and are not supposed to;

and the floor walkers frequently participate in the orgies.

All of this is not to say that a barracks system of confinement properly regulated and limited may not have a place in a well run penal institution. If barracks assignments are confined to small groups of men, properly classified and selected and subject to adequate control, the barracks system is not objectionable and in certain respects may be preferable to confinement in individual cells. It is obvious, however, that the Cummins barracks do not satisfy those conditions.

*The Isolation Cells.*

The isolation cells at Cummins, located in a building set apart to itself and surrounded by a fence, were considered by the Court in *Holt I*. They were found to be overcrowded, filthy, and unsanitary. Pursuant to the Court's order in that case, the overcrowding seems to have been ameliorated; the other conditions still exist.

The Study Commission's report refers to the existence of 12 isolation cells and the construction of 28 more. After the Commission's report was filed, the Legislature authorized the construction of a maximum security unit at Cummins which will be in operation, hopefully, in 1971. After that authorization was given, construction of the additional isolation cells was halted. While there are 12 cells in the isolation unit, one of them has been fitted up as a shower room so that actually there are only 11 cells for the confinement of prisoners.

The isolation unit is guarded by trusties, and free world people seldom come around it. That situation is a source of constant trouble. The trusties threaten and harass the prisoners, and the prisoners probably reciprocate in kind. The isolation diet is carelessly served to the inmates of the cells and at times is permitted to become cold and wet.

The cells are occupied by prisoners who have been confined there for disciplinary reasons or for "protective custo-dy." The isolation inmates who are in "protective custody" are some of the most incorrigible and dangerous prisoners in the Penitentiary. They are sociopathics with no constructive motivation whatever. They damage and destroy fixtures in the cells to the extent of their ability to do so; they set fire to their bedding and to their clothing. They take no interest in the conditions of the cells except to complain about them. They refuse to obey at times the lawful orders of free world people, and obedience has to be compelled by force exerted by free world people and trusty guards; the inmates resist violently and then complain about their "ill treatment."

As the Court understands it, the isolation cells at Tucker are located in the main building of the institution. Some of them are, or at least have been from time to time, occupied by Cummins inmates sent to Tucker for protective custody. The condition of the Tucker isolation cells is about the same as that of the Cummins cells, except that the Tucker cells are inexcusably infested by rats, a problem that does not seem to be particularly troublesome at Cummins.

In view of the fact that the isolation cells are no longer grossly overcrowded, and in view of the fact that most of the conditions existing therein are due to the conduct of the inmates themselves, the cells do not give the Court as serious a constitutional problem as do other aspects of Penitentiary life.

*Lack Of A Rehabilitation Program.*

In Act 50 of 1968 the Legislature recognized the important place of training and rehabilitation in the Arkansas penal program and directed the Department of Corrections to initiate and prosecute such a program. A program has been initiated at Tucker and is doing much good. Nothing has been done at Cummins.

While inmates newly arriving at the Penitentiary are given intelligence and aptitude tests disseminated by the Voca-

tional Rehabilitation Service, the results of the tests are of little official interest. No regard is paid to the tests and their results in assigning prisoners to barracks or to work. As far as the inmates are concerned, the tests are of no benefit whatever.

A large proportion, perhaps a majority, of the inmates of the Penitentiary are ignorant and unskilled. Many are illiterate. The contribution of ignorance and lack of skills and specialization to crime today is well known. If a man who is ignorant and unskilled when he goes into prison can come out with some education and some usable skill, he has an improved chance of staying out of prison in the future. If he comes out as ignorant and unskilled as he goes in, recidivism on his part is almost inevitable.

Since it costs money to confine convicts, more than many taxpayers realize, it would seem to be in the enlightened self-interest of all States to try to rehabilitate their convicts, as the Arkansas Legislature and Respondents have recognized. But, does the Constitution require a program of rehabilitation, or forbid the operation of a prison without such a program?

Many penologists hold today that the primary purpose of prisons is rehabilitation of convicts and their restoration to society as useful citizens; those penologists hold that other aims of penal confinement, while perhaps legitimate, are of secondary importance. That has not always been the prevailing view of what penitentiaries are for, if, indeed, it is today. In years past many people have felt, and many still feel, that a criminal is sent to the penitentiary to be punished for his crimes and to protect the public from his further depredations. Under that view, while there is no objection to rehabilitation, it is not given any priority.

This Court knows that a sociological theory or idea may ripen into constitutional law; many such theories and ideas have done so. But, this Court is not prepared to say that such a ripening has occurred as yet as far as rehabilitation of convicts is concerned. Given an otherwise unexceptional penal institution, the Court is not willing to hold that confinement in it is unconstitutional simply because the institution does not operate a school, or provide vocational training, or other rehabilitative facilities and services which many institutions now offer.

That, however, is not quite the end of the matter. The absence of an affirmative program of training and rehabilitation may have constitutional significance where in the absence of such a program conditions and practices exist which actually militate against reform and rehabilitation. That is the situation that exists in Arkansas today, completely at Cummins and to a lesser degree at Tucker.

It can be said safely that except in a very, very few and unusual cases confinement in the Arkansas State Penitentiary today is the opposite of beneficial. As a generality it may be stated that few individuals come out of it better men for their experience; most come out as bad as they went in, or worse.

Living as he must under the conditions that have been described, with no legitimate rewards or incentives, in fear and apprehension, in degrading surroundings, and with no help from the State, an Arkansas convict will hardly be able to reform himself, and his experience in the Penitentiary is apt to do nothing but instill in him a deep or deeper hatred for and alienation from the society that put him there. And the failure of the State to help him become a good citizen will be compounded by the ever present willingness of his fellow inmates to train him to be a worse criminal.

Thus, the absence of rehabilitation services and facilities of which Petitioners complain remains a factor in the overall constitutional equation before the Court.

*Other Prison Conditions.*

Like the absence of a meaningful rehabilitation program, there are other aspects of prison life which in and of themselves do not rise to constitutional dignity but which aggravate the more serious prison defects and deficiencies. The Court will mention some of those aspects briefly.

Medical and dental facilities leave much to be desired. It is not so much that the facilities and services themselves are particularly inadequate for institutions like Cummins and Tucker; rather, it is their unavailability to an inmate when needed that creates the problem. That is largely the fault of the trusty system. If an inmate needs to see the doctor or the dentist, that need is not filled if he is not permitted to go to the infirmary; and it does him no good to go to the infirmary if the doctor is not there when he arrives. Nor does prescribed medication do him any good if it is withheld by a trusty. Making due allowance for malingering, and the Court is sure that there is much of it, there is a great deal of room for improvement in this area of prison life.

Sanitary conditions in the kitchen at Cummins are deplorable according to the testimony of Respondents' own medical witness. Again, that is due largely to the fact that trusties are in charge of the kitchen and do not care whether it is kept clean or not.

The evidence is to the effect that the State supplies its convicts with nothing but the bare necessities of life; no niceties are supplied. Granted, that the State may not be required constitutionally to make it possible for a convict to live comfortably, its failure to do so certainly operates to lower inmate morale. A man who gets only one toothbrush and one tube of toothpaste, who is supplied with no towels, and with insufficient socks and underclothing, and who is required to sleep night after night on filthy bedding is certainly not stimulated to take any pride in himself or to try to be a good inmate of the Penitentiary to say nothing of being a good citizen in the free world when he is released.

It now becomes necessary for the Court to consider in combination the aspects of the Penitentiary System which it has endeavored to describe separately, and to determine whether the situation as a whole is such that confinement in the Arkansas Penitentiary constitutes a cruel and unusual punishment within the prohibition of the Constitution.

In Jackson v. Bishop, supra, 404 F.2d 571, the Court discussed the concept of "cruel and unusual punishment" in some detail; and in the recent criminal cases that have been mentioned this Court undertook to define the term to trial juries.

The term cannot be defined with specificity. It is flexible and tends to broaden as society tends to pay more regard to human decency and dignity and becomes, or likes to think that it becomes, more humane. Generally speaking, a punishment that amounts to torture, or that is grossly excessive in proportion to the offense for which it is imposed, or that is inherently unfair, or that is unnecessarily degrading, or that is shocking or disgusting to people of reasonable sensitivity is a "cruel and unusual" punishment. And a punishment that is not inherently cruel and unusual may become so by reason of the manner in which it is inflicted.

Assume that a person accused of an ordinary felony in Arkansas, say grand larceny, pleads not guilty and stands trial before a jury. The jury finds him guilty, and under Arkansas law may fix his punishment at imprisonment in the Penitentiary for any number of years not less than one nor more than 21. The Circuit Judge accepts the verdict and acting more or less ministerially imposes sentence in accordance with the verdict of the jury.

The convicted person receives his sentence of course; but, he receives much more than that. By his sentence he is subjected to the conditions that have been described; conditions about which the trial jury probably knew little, if

anything, and about which the sentencing judge may have been equally ignorant.

For the ordinary convict a sentence to the Arkansas Penitentiary today amounts to a banishment from civilized society to a dark and evil world completely alien to the free world, a world that is administered by criminals under unwritten rules and customs completely foreign to free world culture.

After long and careful consideration the Court has come to the conclusion that the Fourteenth Amendment prohibits confinement under the conditions that have been described and that the Arkansas Penitentiary System as it exists today, particularly at Cummins, is unconstitutional.

Such confinement is inherently dangerous. A convict, however cooperative and inoffensive he may be, has no assurance whatever that he will not be killed, seriously injured, or sexually abused. Under the present system the State cannot protect him.

Apart from physical danger, confinement in the Penitentiary involves living under degrading and disgusting conditions. This Court has no patience with those who still say, even when they ought to know better, that to change those conditions will convert the prison into a country club; the Court has not heard any of those people volunteer to spend a few days and nights at either Tucker or Cummins incognito.

The peril and the degradation to which Arkansas convicts are subjected daily are aggravated by the fact that the treatment which a convict may expect to receive depends not at all upon the gravity of his offense or the length of his term. In point of fact, a man sentenced to life imprisonment for first degree murder and who has a long criminal record may expect to fare better than a country boy with no serious record who is sentenced to a term of two years for stealing a pig.

It is one thing for the State to send a man to the Penitentiary as a punishment for crime. It is another thing for the State to delegate the governance of him to other convicts, and to do nothing meaningful for his safety, well being, and possible rehabilitation. It is one thing for the State not to pay a convict for his labor; it is something else to subject him to a situation in which he has to sell his blood to obtain money to pay for his own safety, or for adequate food, or for access to needed medical attention.

However constitutionally tolerable the Arkansas system may have been in former years, it simply will not do today as the Twentieth Century goes into his eighth decade.

IV. *The Fourteenth Amendment— Racial Segregation.*

The Fourteenth Amendment prohibits racial discrimination within prisons, and the prohibition extends to the racial segregation of inmates. Board of Managers of the Arkansas Training School for Boys at Wrightsville v. George, 8 Cir., 377 F.2d 228, 232; cf. Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030, and Lee v. Tahash, 8 Cir., 352 F.2d 970.

As to Tucker the Court finds that that facility is essentially integrated, and that no substantial desegregation problem exists there. With respect to Cummins, certain aspects of prison life have been integrated, and Respondents recognize their duty to eliminate all vestiges of racial segregation, including separate barracks for white and Negro inmates, both rankers and trusties.

Respondents contend, however, and the Court agrees, that to order immediate desegregation of the barracks would create disciplinary problems that Respondents are not able to solve at the moment and would tend to make the already bad situation at the Penitentiary substantially worse than it is.

It must be remembered that we are not dealing here with school children. We are not dealing with free world housing; we are not dealing with

threatres, restaurants, or hotels. We are dealing with criminals, many of whom are violent, and we are dealing with a situation in which the civilian personnel at the Penitentiary are not in control of the institution.

In such circumstances, while the inmates at Cummins are going to have to be integrated, the Court thinks that the process should be part of the overall transition of the Penitentiary from an unconstitutional to a constitutional institution, which transition will be discussed in the following and final section of this opinion.

## V. The Relief To Be Granted.

As has been seen, Petitioners seek both declaratory and injunctive relief. They also seek relief for themselves as individuals and for other convicts similarly situated. Two aspects of those prayers give the Court little or no trouble.

As far as the individual claims of the individual Petitioners are concerned, including the individual complaints of inmates now in isolation, the Court does not consider that any of the Petitioners has made a case for specific individual relief.[5] However, all of the Petitioners are subject to the overall situation which renders the Penitentiary unconstitutional and all are entitled to class relief with respect to that situation.

As to the claim for declaratory relief, the Court will declare that to the extent indicated heretofore confinement in the Arkansas Penitentiary System under existing conditions amounts to a cruel and unusual punishment constitutionally prohibited. While the situation at Tucker is much better than that which exists at Cummins, the fact remains that Tucker inmates, like those at Cummins, are subject to the trusty system, including the trusty guard system, and are also confined in large numbers in open barracks. That the situation at Tucker is less severe than that at Cummins seems to the Court to be more significant from the standpoint of the injunctive relief to be ordered than from the standpoint of declaratory relief.

The Court will also declare that racial discrimination in the Penitentiary System, including racial segregation of inmates, is a violation of the Equal Protection Clause of the Fourteenth Amendment and must be eliminated.

That brings the Court to the question of injunctive relief, and it will take occasion to repeat here what was said in *Holt I* when the Court reached the point in that opinion which it has now reached in this opinion (p. 833 of 300 F.Supp.):

"The task of the Court in devising a remedy in this case is both difficult and delicate.

"Subject to constitutional limitations, Arkansas is a sovereign State. It has a right to make and enforce criminal laws, to imprison persons convicted of serious crimes, and to maintain order and discipline in its prisons. This Court has no intention of entering a decree herein that will disrupt the Penitentiary or leave Respondent and his subordinates helpless to deal with dangerous and unruly convicts.

"The Court has recognized heretofore the financial handicaps under which the Penitentiary system is laboring, and the Court knows that Respondent cannot make bricks without straw."

5. One of the Petitioners, James E. Jackson, a Negro inmate of the isolation unit at Cummins wrote the Court in advance of trial expressing the view that the Court was biased, prejudiced and corrupt, and that the Court is a racist. Jackson repeated his statements when called to the witness stand. While the Court is not sensible of any feelings of bias or prejudice in the case and is not aware of anything that would justify a charge of racism or corruption, the Court nevertheless disqualified itself in open court as far as Jackson's individual claim is concerned. He is free to litigate that claim further before some other Judge if he cares to do so.

Respondents will be ordered to make a prompt and reasonable start toward eliminating the conditions that have caused the Court to condemn the System and to prosecute their efforts with all reasonable diligence to completion as soon as possible. The lives, safety, and health of human beings, to say nothing of their dignity, are at stake. The start must be prompt, and the prosecution must be vigorous. The handwriting is on the wall, and it ought not to require a Daniel to read it. Unless conditions at the Penitentiary farms are brought up to a level of constitutional tolerability, the farms can no longer be used for the confinement of convicts.

The questions that trouble the Court at this juncture are: What must be done within the immediate future, and how long should Respondents be allowed to achieve their ultimate objective? In approaching those questions certain things should be kept in mind.

First, over the past several years conditions at the Penitentiary have ameliorated somewhat, due in part, but by no means entirely, to the decrees of this Court in the earlier stages of the overall litigation. The alleviation began in the mid-sixties when Dan D. Stephens became Superintendent of the Penitentiary, and it has continued under his successors. While the Penitentiary is still a bad place, an unconstitutional place in the Court's eyes, it is in some respects a better place than it was several years ago.

Second, the legislation adopted in 1967, 1968, and 1969, the report of the Study Commission, and the report to the Commission on Crime and Law Enforcement, indicate that the Arkansas State government is more interested than ever before in the prison system and is aware of the fact that the system is deficient. That increasing awareness of the problem is evidenced not only by the items just mentioned but also by increased appropriations for the Penitentiary over the past several years.

Third, notice may be taken of the fact that the Governor of Arkansas has issued his call for the Legislature to meet in special session on March 2 of the current year. Legislation for the benefit of the Penitentiary is included among the numerous items on the agenda, although the specific nature of the legislation to be sought has not yet been spelled out, and the scope of it may depend to some extent on the provisions of the Court's decree in this case.

It is obvious that money will be required to meet the constitutional deficiencies of the institution, and there is no reason to believe that, subject to the overall financial needs and requirements of the State, the Legislature will be unwilling to appropriate necessary funds.

Finally, if Respondents had unlimited funds at their disposal tomorrow, they could not solve their constitutional problem overnight. Obviously, free world people are going to have to be recruited and employed, and that is going to take some time. In this connection it should be emphasized that to replace trusties with venal, corrupt, sadistic, and underpaid civilian employees would be but to substitute another form of tyranny for that which now exists. Thus, Respondents are going to have to be allowed some reasonable period of transition within which to achieve their objective, but that period is going to have to be measured in months, not years.

The Court thinks in this context, as it has thought in other contexts, that Respondents should be given an opportunity to come forward with a plan to eliminate existing unconstitutionalities, to state what they plan to do, and how long they plan to take to do it. The Court also thinks, however, that it should now proceed to lay down some guidelines for Respondents and should mention what it now considers will probably be minimum requirements if persons are going to continue to be confined in the Penitentiary.

 This Court rejects out of hand any approach that would phase out the trusty guard system as such while leaving intact other aspects of the overall

trusty system even more objectionable than the guard system itself. All of the trusties are going to have to be brought under control; and trusties, whether guards or not, are going to have to be stripped of their authority over the lives and living conditions of other convicts. Responsibilities that ought to be discharged by free world people may no longer be delegated to trusties whether in the office, in the infirmary, the kitchen, or the fields. Trusties must not have it in their power to bring about promotions or demotions of other inmates and must not be allowed to stand as obstacles to reasonable access of ordinary inmates to civilian employees. The right of a man to talk to the Superintendent or the Assistant Superintendent, or to go to the infirmary when necessary, or receive necessary treatment or medication, must not be permitted to depend on the whim of one or more trusties. It should be taken out of the power of trusties to steal prison food for resale, and it should go without saying that trusties ought not to have access to addictive or stimulating drugs in the prison pharmacy.

The Court thinks that when the trusties as a class are deprived of their authority over inmates, they will largely lose the power of extortion and other undesirable powers which they now possess. This does not mean that trusties may not be assigned responsible jobs, but they must be "jobs," not "offices of profit," and they must be performed under adequate supervision.

While the Court is not prepared at this juncture affirmatively to order the elimination of the trusty guard system or a commencement of a general phase out of the system, the system is going to have to be overhauled. The tower guards and picket guards give the Court no particular problem; the gate guards and the field guards do.

As to the gate guards, it seems evident to the Court that without the connivance of such guards the widespread smuggling of contraband into the prison which is now practiced would be impossible or at least would be made much more difficult. Additionally, gate guards have opportunities for extortion and corruption that other guards do not possess. The gate guards should be replaced by free world personnel as soon as possible.

The system of field guards and the system of using trusty long line riders and inmate pushers go hand in hand, and the combination of the two is one of the things that makes the field guard system so dangerous to rankers. Field guards are much less likely to fire on a ranker or on a group of rankers in the immediate presence of a civilian long line supervisor than they are in a situation where the rankers are actually being worked by other inmates. It appears to the Court that the answer, however unpalatable it may be, is to eliminate the positions of long line rider and inmate pusher and to put each long line under the immediate charge of one or more free world people.

The barracks system of confinement has got to be changed, and the change cannot wait on the completion of the maximum security unit that has been mentioned. The barracks are going to have to be made smaller by subdividing existing barracks or otherwise, and more discrimination, other than racial, is going to have to be practiced in assigning men to barracks. It may be necessary to proceed with the construction of more isolation cells at Cummins to take care of men who simply should not be assigned to barracks.

Apart from the foregoing Respondents are going to have to do more than they have done in the past about keeping order in the barracks at night and about protecting inmates from violent assaults of whatever kind.

As to the isolation cells, while the plight of the inmates is largely of their own doing, they are suffering seriously from neglect. Free world people may no longer leave those inmates to the mercies of trusty guards; additionally, the Court thinks that the method of serving

them their food must be changed so as to make sure that it gets to them in more sanitary and palatable condition. In that connection the report to the Commission on Crime and Law Enforcement points out, among other things, that the people in isolation have "no decent or Christian" way in which to eat their food. The report suggests that prisoners in isolation be taken from the cells to the main dining hall to eat either before or after other inmates have been served. That recommendation should be within the power of Respondents to follow without substantial expense and without danger to any inmates.

If Respondents will move in good faith and with diligence in the areas of prison life just discussed, namely, the trusty system, the barracks system, inmate safety, and the isolation cells, the Court thinks that subsidiary problems will tend to take care of themselves. It would be a mistake to order too much at this time; but, in the areas just mentioned Respondents will be required to move. And, of course, the remaining vestiges of racial segregation must be eliminated.

The Court will not be dogmatic about time just now. If there are things that Respondents can do now with available funds and personnel, they will be expected to do them now. If necessary steps cost money, and they will, Respondents must move as rapidly as funds become available. The opening of the new maximum security unit in 1971 should be set as at least a tentative target date for the completion of the removal of unconstitutional conditions and practices. The schedule on which Respondents will be required to move may be shortened or lengthened as circumstances and developments may dictate.

At the moment Respondents will be ordered to submit to the Court and to counsel for Petitioners not later than April 1 of this year a report and plan showing what, if anything, they have done up to that time to meet the requirements of the Court, what they plan to do, and when they plan to do it.

If the initial report is approved, the Court may require additional reports from time to time and may require specific information in certain areas. If the initial report is not approved, it will then become necessary for the Court to consider what specific steps it will take to implement its declarations of the unconstitutionality of the existing system.

Let there be no mistake in the matter; the obligation of the Respondents to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or upon what the Governor may do, or, indeed, upon what Respondents may actually be able to accomplish. If Arkansas is going to operate a Penitentiary System, it is going to have to be a system that is countenanced by the Constitution of the United States.

A decree in accordance with the foregoing will be entered.