BLANCHE, Judge.
This is an action to enjoin the use of armed inmate guards at the Louisiana State Penitentiary (hereinafter referred to as “Angola”). Plaintiffs are inmates at Angola.
Plaintiffs, Paul George, Thomas Perrin, Guy Glynn, Darrell Morris and Robert Al-bright, brought this action against Louis M. Sowers, Director of the Louisiana Department of Corrections, C. Murray Henderson, Warden of the Louisiana State Penitentiary, and the State of Louisiana, seeking an injunction to prohibit the use of inmate guards at Angola on the grounds that such practice amounts to cruel and unusual punishment and a denial of due process. U.S.Const. Arts. 8 and 14. In addition, plaintiffs sought a declaratory judgment recognizing that supplying inmate guards with firearms and ammunition is in violation of the Gun Control Act of 1968, 18 U.S.C.A. § 922(a)(1) and (2). This last contention has been abandoned.[1]
The district court denied plaintiffs’ petition for injunctive relief, and they have appealed.
The facts, which we adopt from the trial judge’s well-written Reasons for Judgment, are as follows: [2]
“Presently Angola has approximately 3700 inmates. There are approximately 2S0 inmate guards and 261 free guards. Only the inmate guards normally are armed. Their primary duty is to guard the medium security inmates, known as ‘Big Stripers’ while they work in the fields.
“The usual procedure in the fields is as follows: a work gang is given a designated area to hoe, cultivate or cut. Said area is usually rectangular in shape. The inmates are instructed to remain inside the imaginary lines of the rectangle. A guard, armed with a high powered rifle or shot gun, is stationed at each point of the rectangle. If an inmate crosses the guard lines he is considered as trying to escape and can be shot. If an inmate gets too close to the line he might get a warning shot fired over his head or at his feet. Needless to say, it is important *67 for the workers to know at all times where the lines are. This technique is known as working ‘under the gun.’
“The use of convict guards was re-established at Angola in 1962 when the prison’s appropriation was severely cut. Louisiana, along with Mississippi and Arkansas, are the only states which use inmate guards. Arkansas is presently under Federal Court order to abolish their trusty-guard system.
“The Court listened intently as all of the plaintiffs testified with regard to their experiences with the guards. To put it very mildly they convinced the Court of their deep-rooted hatred of convict guards. Jack Wright, a professor of Criminology at East Carolina University, who had been director of classification at Angola in the summer of 1968, testified and explained the reason for the hatred: ‘an inmate guard is anathema to all prisoners because he violates the one norm which all inmates have— the burning desire for freedom.’ A free guard does not receive the same sort of enmity. The convict feels that the convict guard, while a member of his own culture, has betrayed that culture to accept a status role. So in the words of Dr. Wright we have:
‘. . . in the inmate guard is a structural accommodation, in which the inmate guard furthers the formal goals of the institution without internalizing the law-abiding norms which justify this institution. He is the duckbill platypus of socialized classification. He is a nomic. He has no strong cultural ties either to the free world or what you would normally think as his peer group in the inmates. He just forms a symbiotic social alliance with the prison in order to reduce the rigors of incarceration and as soon as he is released, he will return, as 62% of them do, to his life of crime. We are using the word “guard”. These men are not in. there, as the old prison workers say, for singing too loud in church. The primary crime for which they were convicted was a crime of violence. Second to that was forgery.’
“No one is required to be a convict guard. The inmate must be willing. Dr. Wright testified that you don’t want too intelligent a man, or a man too squeamish. After an inmate is made a guard he is segregated from the rest of the prison population and placed in Compound F, where he stays until his release.
“Dr. Wright in his studies found that most guards were borderline mental re-tardates. The white guard has an average I.Q. of 84 while the black guard has an I.Q. of about 69%.
“Everyone who testified was in agreement that the use of convict guards was a bad practice.
“Dr. Wright felt it was not a good idea to use convicts as guards for several reasons: (1) they (guards) have exhibited by the fact they are convicted felons that they are unable to adjust to free society yet are placed in the position of having power of life or death over fellow convicts. Also, he felt the convict guard system created bitter resentment among other inmates. Finally, he felt that it was unfair to the guard himself for he is not free to participate in the real rehabilitation program offered by the penitentiary. In this regard it should be pointed out that the rate of recidivism is much greater for the convict guard, about 62% compared to 50% for the general penitentiary population. If the recidivist goes back to Angola he is given his gun back and some probably gravitate back to prison for this very reason. However, if he falls in another, state where there are no convict guards his life is endangered because if the inmates find out what his status was formerly he will be beaten up or killed.
“Dr. Wright described the use of convict guards as a pernicious system. Warden Henderson testified that the *68 system was bad and contra to good penal practice.
“Warden Hayden Dees, a long time Angola career employee, said he felt the use of convict guards was morally wrong. He did say that the system has worked quite well, however.” (Written Reasons for Judgment, Record, pp. 29-31)
Undoubtedly, the use of armed inmate guards is an anachronism in this enlightened era. That it represents an unsound policy was not disputed by any of the witnesses. That inmate guards are less capable of exercising the discretion vested in them, and more likely to abuse the power vested in them than free guards, was clearly established by the record. Nevertheless, we are unable to conclude that the use of armed inmate guards amounts to cruel and unusual punishment or a denial of due process.
The principal authority relied on by plaintiffs, Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark.1970), held that Arkansas’ use of armed inmate guards violated the prohibition against cruel and unusual punishment. The Federal District Court described the situation in the Arkansas prison as follows :
“. . . The trusties run the prison. They not only guard other inmates; they also perform many administrative tasks normally performed by free world people, and their authority over other convicts of lesser rank is great. Commissioner Sarver testified without contradiction that more than 90 percent of prison functions relating to inmates are performed by trusties. The few free world people are only nominally in command of the situation at Cummins, and the trusties could take it over in a moment. Perhaps the reason they do not do so is that they do not want to spoil a good thing.
“The extent of Arkansas’ reliance on trusties is apparent when it is realized that there are only 35 free world employees at Cummins in ostensible charge of slightly less than 1,000 men. Of those 35 only eight are available for guard duty, and only two of them are on duty at night.

“Apart from the use of trusties as guards, they can be given too much authority in other areas of prison life. When that is done, various abuses come into existence. When all is said and done, the fact remains that a trusty is a convict, and many trusties will on occasions act like felons and thieves. They will take bribes, they will engage in extortion, they will smuggle contraband, and they will connive at violations of prison rules. Opportunity for abuse is particularly present where, as in Arkansas, trusties have access to prison records pertaining to themselves and to other inmates. A trusty with such access can remove damaging material, such as a detainer, from an inmate’s file; he can insert improper material; or he can impart to other inmates confidential information that ought not to be imparted. The undesirability of having prison telephone communications with the outside world in the control of trusties, as it is in Arkansas, is too obvious to require description. [Holt v. Sarver, 309 F. Supp. 362, 373-374]” (Written Reasons for Judgment, Record, p. 34)
At Angola the use of armed inmate guards is considerably more restricted.[3] The un-contradicted evidence in this case clearly establishes that no inmate has access to another inmate’s record; free guards are the only guards stationed at the receiving desk, thereby virtually eliminating the possibility that inmate guards can engage in smug *69 gling contraband; and inmate guards are constantly under the supervision of free guards, thereby removing, or at least reducing, the threat of physical abuse. It is clear that Holt, supra, did not intend to declare the use of inmate guards per se unconstitutional.[4]
A reading of the record reveals that the major complaint of the inmates concerning the use of inmate guards (other than the fact that the inmates hate the inmate guards as traitors to their system) is that they feel that some of the inmate guards are trigger-happy and that they unnecessarily discharge their weapons.
Because of the inimical feelings which the general prison population has toward inmate guards, the inmate guards are under more stress than other prison guards. We feel that the combination of the fear which the inmate guards have of their prisoners, the general low intelligence quotient of inmate guards and the total lack of training results in the placing of the power of life and death over the prisoners in persons who are ill-equipped to exercise the judgment required of the reasonable law enforcement officer.
In spite of the enmity felt toward inmate guards by other prisoners and the likelihood that some of the inmate guards had a personal grudge against some of the other prisoners,[5] the evidence does not establish that the use of armed inmate guards results in widespread brutality or in the senseless killing or maiming of convicts who inadvertently stray from their assigned work areas. It should be noted that the inmate guards are instructed by the prison officials to fire a warning shot in the air or into the ground when any prisoner strays from his work area, the inmate guards being entitled to assume such prisoner is attempting to escape. However, none of the inmates who testified before the district court complained of being physically brutalized by inmate guards, although two did testify that shots were fired at their feet for no good reason.
While the inmate guards may lack the training and the mental capacity to properly perform the job with which they are entrusted, we cannot find that this amounts to cruel and unusual punishment or a denial of due process of law. Unlike the situation in Holt, supra, the inmate guards cannot be said to be running the prison. Their duties are limited, for the most part, to guarding inmates while working in the field. The record clearly shows that at all times the inmate guards are under the supervision and control of free guards and that abuses are punished.
While we agree that the use of inmates as armed guards is a bad practice, we find that the evidence is insufficient to sustain plaintiff’s contention that the use of armed inmate guards amounts to cruel and unusual punishment or a denial of due process.[6]
*70 For the foregoing reasons, the judgment of the trial court denying plaintiffs’ application for injunctive relief is affirmed, at plaintiffs’ costs.
Affirmed.

. The trial court found that there was no merit to this contention.

. We note that there was little dispute as to the facts in this case, the only issues presented being whether the situation described amounted to cruel and unusual ‘punishment or a denial of due process.

. “The use of trusty guards is universally condemned by penologists, and the system is now in use only in Arkansas, Louisiana, and Mississippi. According to Director Bennett, the reliance that Louisiana places upon trusty guards is much less than that which exists in Arkansas. . ” (Holt v. Sarver, 309 F.Supp. 362, 373 — Emphasis supplied)

. “This does not mean that trusties should never he given responsible jobs. One of the chief functions of rehabilitation is to teach convicts to assume and discharge responsibilities. But, it does mean that the areas of trusty responsibility should be limited, and that the trusties, both individually and as a body, should be under the full control and adequate supervision of free world people.” (Holt v. Sarver, 309 F.Supp. 362, 374 — Emphasis supplied)

. Three of the plaintiffs testified that certain inmate guards had expressed a personal dislike for certain prisoners. Because of their “personal beliefs” they refused to disclose the names of any particular guard who had expressed a personal dislike for other prisoners.

.“The Court, however, is limited in its inquiry to the question of whether or not the constitutional rights of inmates are being invaded and with whether the Penitentiary itself is unconstitutional. The Court is not judicially concerned with questions which in the last analysis are addressed to legislative and administrative judgment. A practice that may be bad from the standpoint of penology may not necessarily be forbidden by the Constitution. And a prison system that would be excellent from the point of view of a modern prison administrator may not be required by the provisions of the Constitution with which the Court is concerned.” (Holt v. Sarver, 309 F.Supp. 362, 369)