Harold M. **FIFE**, Plaintiff,

v.

Roger W. **CRIST**, Warden of Montana State Prison, and James Blodgett, Deputy Warden, et al., Defendants.

Earl **TAYLOR**, Plaintiff,

v.

Roger W. **CRIST**, Warden of Montana State Prison, and James Blodgett, Deputy Warden, et al., Defendants.

Nos. 2211, 2212.

United States District Court, D. Montana, Butte Division.

Aug. 21, 1974.

William A. Brolin, Anaconda, Mont., for plaintiffs.

M. K. Daniels, Deer Lodge, Mont., for defendant.

## MEMORANDUM AND ORDER

WILLIAM D. MURRAY, Senior District Judge.

Both of the above entitled cases were brought by inmates of the Montana State Prison. Since they involve similar questions of law, they will be treated as companion cases in this memorandum.

Fife and Taylor filed civil rights complaints against the Warden and Deputy Warden of the Montana State Prison. Both complaints challenge the procedures utilized by prison officials in disciplinary actions and the conditions of various forms of extraordinary confinement. Declaratory judgments, injunctions, and damages were requested by both plaintiffs.

### FINDINGS OF FACT

Two primary factual conflicts were presented to the court during the trial of these suits. The first concerned the conditions experienced by the plaintiffs while confined in various disciplinary areas. The second concerned the circumstances surrounding the disciplinary actions taken against the plaintiffs.

The factual dispute with regard to the first area was in part created because of the constant changes implemented by Warden Crist in an effort to align prison policies with changes in the law. Testimony given during the trials, however, indicates that the following conditions existed in the various areas of extraordinary confinement at the times they were occupied by the plaintiffs.

The area known as the Hole was located near the prison infirmary. The cell was approximately 8' x 8' x 8', and was constructed of concrete and sheet metal. A hole in the corner served as a toilet, and was flushed automatically at specified intervals. Light entered through a screened hole in the ceiling, and was controlled by guards outside the cell. There was contradictory testimony as to how long the light was on, but the estimates ranged upward from four hours a day. Prisoners were allowed regular prison clothes except that they were not permitted either shoes or belt. A mattress and a blanket were provided for sleeping. One full meal was served during the evening, and the prisoners received three slices of bread and a pitcher of water in the morning. Only legal

and religious materials were given to the prisoners. Isolation from others while confined in the Hole was total.

The maximum security area was located in a compound adjoining the principal prison structure itself. The single cells were 8′ x 12′, contained a metal bunk, and were without windows. A light bulb was provided for light, and the inmate could control the hours of light in the cell. Some of the cells had only a bucket to be used as a toilet, and inmate Fife's testimony that his cell was so equipped during much of the time he spent in maximum security stands uncontroverted. Inmates wore regular prison clothes. Two full meals were served each day, and daily showers were available. All items necessary for personal hygiene were provided. Inmates were allowed minimal exercise. Reading materials were allowed, but other privileges were generally curtailed.

Segregation cells were similar to regular cells, and no privileges other than those requiring freedom to move about the institution were taken from the inmates. According to general prison policy, segregation was not intended as a punitive measure, but was used only to aid the orderly management of the institution.

The second factual dispute involved the alleged infractions committed by the plaintiffs and the nature and extent of disciplinary proceedings utilized by the defendants. Each plaintiff will be discussed separately.

### (1) Harold M. Fife

On March 14, 1972, inmate Fife was carrying out his prescribed duties in the kitchen of the Montana State Prison. At approximately 3:45 that afternoon, Fife dropped a butter knife into the lock on the "cooler", thereby securing another inmate inside. The work supervisor, Mr. Pancratz, removed the butter knife and let the other inmate out. He then reprimanded Fife and attempted to place him on "extra duty", which on this occasion consisted of cleaning the hoods

and stacks over various steam pots. Mr. Fife refused, saying that he did not feel that his actions warranted an assignment of extra duty. Mr. Pancratz informed inmate Fife that a conduct report would be filed and then had Fife taken to the cell house.

After arriving at the cell house, Fife was instructed by Sergeant Gerke to remain in his cell until appearing before the Disciplinary Committee the following day.

Sometime later that evening Sergeant Gerke checked Fife's cell and found it empty. Fife was located in the TV room and told to return to his cell. He was verbally informed that he had failed to obey a direct order and was placed in the Hole.

The following day Deputy Warden Blodgett and three other officers went to the Hole to talk to Fife. Testimony established that it was not usual procedure to hold disciplinary hearings in the Hole, but that it was done when extraordinary circumstances necessitated it. No testimony was given as to what extraordinary circumstances were involved here. Deputy Warden Blodgett entered the doorway of the cell and stood in a narrow hallway. The other members of the Committee stood behind him. The lights were not on at that time and Fife did not see the other members of the Disciplinary Committee.

Fife was not given Pancratz' written statement or any other written evidence of the charges against him. The charges were read. Fife stated that he did not think he had done anything to warrant punishment, indicating an admission of guilt as to the locker incident and the failure to obey Mr. Pancratz' order to do extra duty. Deputy Warden Blodgett then left. The recommendation of the Committee that Fife remain in the Hole until March 17, 1972, was never communicated to Fife.

On the 17th of March, Fife was removed from the Hole and allowed to prepare to travel to another town where he was to testify in a trial. During this

procedure, a disagreement arose concerning the whereabouts of Fife's pipe. According to the resulting conduct report, Fife used abusive language in addressing the corrective personnel. As a result of this report, Fife was again placed in the Hole upon his return to the prison. The Disciplinary Committee did not visit Fife at all with regard to this action. Fife remained in the Hole until the next day, at which time he was allowed to return to the general prison population.

On Arpil 11, 1972, inmate Fife was called to Deputy Warden Blodgett's office and informed that he had been accused of stealing a watch. No written charges were given to Fife prior to being called to the Deputy Warden's office. Fife denied the accusation and demanded a hearing and representation. Blodgett refused to hold the hearing and ordered that Fife be taken to maximum security. No disciplinary hearing was held at any time during the ensuing five weeks which Fife spent in the maximum security area.

Deputy Warden Blodgett testified that he could not hold such a hearing because he could not bring forth either the victim nor the informant who had returned the watch because of possible retaliation by Fife. Therefore, Fife was allegedly placed in maximum security (with increased privileges) not as punishment, but simply for administrative reasons. Blodgett testified that such administrative procedures gave him the necessary "flexibility" with which to "retain him [Fife] for this particular offense." The order directing that Fife be placed in maximum security under administrative segregation was contained on a paper entitled Disciplinary Committee Report.

Not long after being placed in maximum security, Fife sent a request for an interview to Warden Crist. This request was denied, and Fife was told again, this time by letter, that he was not being punished. It should be noted that Fife was receiving more privileges than those who were in maximum security for announced punishment purposes.

However, it is also true that Fife was only receiving two meals a day and that at least part of the time he was required to use a bucket for a toilet. No reason was given why Fife was placed in the maximum security section with some additional privileges rather than in the administrative segregation section.

The court feels compelled to find that Fife's confinement in maximum security, because of charges that he stole a watch, constituted punishment. If prison administrators could so easily escape the procedural requirements of due process by changing the nominal description of an inmate's special confinement, the protections of the Due Process Clause would be rendered illusory.

On the morning of July 7, 1972, inmate Fife was again instructed to report to Deputy Warden Blodgett. He was told that he had been charged with stealing another watch. Fife denied the charge. He was again placed in maximum security without the benefit of a disciplinary hearing. He remained there until the section was abandoned as a disciplinary area, at which time he was moved to administrative segregation. He remained in segregation until November 3, 1972.

### (2) *Earl Taylor*

On the evening of April 28, 1972, inmate Taylor was removed from his cell and escorted directly to the Hole. Sergeants Wyant and Styron testified that boisterous activity prompted them to investigate Taylor's cell. They suspected that Taylor was high on glue because the smell of glue was very strong. After being placed in the Hole, Taylor asked when he would go before the Disciplinary Committee. Sergeant Wyant replied: "Probably tommorrow or the next day."

Taylor did not see the Committee during the next two days, nor the following nine. On the eleventh day of confinement, Taylor again asked Sergeant Wyant when he was going to get out of the Hole or go before the Disciplinary Committee. Sergeant Wyant said he

thought Taylor had been in the Hole long enough, and stated that he would bring the matter to the attention of the Deputy Warden.

The next day Taylor went before the Disciplinary Committee in Deputy Warden Blodgett's office. No written charges were given to Taylor before the hearing. When asked if he had been sniffing glue on the evening he was taken to the Hole, Taylor replied that he had been, but that he did not intend to try it again. Taylor was then allowed to return to the general prison population.

On May 12, 1972, Taylor was again charged with sniffing glue and taken to the Hole. According to the report filed by Sergeant Styron, Taylor was obviously high on glue when he and Sergeant Wyant arrived. He was taken directly to the Hole. He swore at both officers while being taken to the disciplinary area. After being placed in the disciplinary cell, Taylor threw a water pitcher at Officer Styron.

Taylor spent four days in the Hole. Although Taylor denies it, reports submitted by defendants indicate that a disciplinary hearing was held on May 16, 1972, at the end of the four day period.

According to the report, Deputy Warden Blodgett, Sergeant Styron, Sergeant Wyant and Mr. Yankowski constituted the Disciplinary Committee. Taylor allegedly admitted having the glue, but stated that his intoxicated condition "was an accident". The Committee recommended that Taylor be moved from the Hole to maximum security for an indefinite period.

No written charges were given Taylor prior to going before the Committee. Some of the members of the Disciplinary Committee were directly involved in the incidents leading to Taylor's confinement in the disciplinary area. Sergeant Styron had filed one of the conduct reports involved in the hearing. Finally, no written statement of the evidence relied upon by the Committee was given to Taylor after he was placed in

maximum security for an indefinite period of time. Taylor spent one month in maximum security before being released back into the general prison population.

In the early evening of July 29, 1972, inmate Taylor was in the hobby room with other inmates. Taylor was working with leather. Two other inmates, Doney and Cardinal, were playing pool. Officer Johnson, who was on a shakedown crew that evening, saw Taylor, Doney and Cardinal with a plastic bag in the hobby room. They were raising the bag to their mouths and inhaling from it. It was obvious to Officer Johnson that they were sniffing glue. Officer Johnson reported the event to the corrective personnel assigned to the area. Johnson's testimony is confirmed by the conduct report filed by Officer Cyr.

Sometime later in the evening, all the inmates involved in the alleged glue sniffing incident were taken from their cells. Officer Burdette and Officer Cyr found Taylor awake, sitting on his bunk. Taylor smelled strongly of glue, his speech was slurred and he was belligerent Taylor asked Officer Cyr why he was being taken to the Hole. He was told that he was being taken to Disciplinary for sniffing glue. Taylor swore at both officers while being escorted to the Hole. When they came to the Hole Taylor said "I don't think I'm going in." Burdette stepped in to block Taylor's path away from the cell, and Taylor struck him in the mouth. Taylor was then subdued and placed in the cell.

On July 31, three days after being placed in the Hole, Deputy Warden Blodgett and other members of a Disciplinary Committee visited Taylor in the disciplinary area. They read the charges of striking an officer and glue sniffing to him and asked him what he had to say. According to the Disciplinary Committee report filed by Deputy Warden Blodgett, Taylor admitted both charges. The Committee then recommended a long term segregation in maximum security.

On August 3, 1972, Taylor was transferred to maximum security. He remained there until September, and was then moved to segregation. He was not returned to the general prison population until sometime in November.

Again, no written charges were provided to Taylor, nor did he receive written findings of fact after the disciplinary actions were imposed.

Plaintiff Taylor also states that he received inadequate medical care while confined in the various disciplinary areas. His primary complaint relates to his confinement in maximum security and segregation during the fall of 1972. While in maximum security, Taylor developed a rash. He told Officer Dodge about his condition on a Tuesday but did not see Doctor Benjamin until the following Friday. Testimony during trial established that there were two specific days a week during which an inmate could see a doctor unless emergency treatment was required. Nothing was presented indicating that Taylor's complaint constituted an emergency, nor that standard medical procedures weren't followed. It was discovered that Taylor had a skin disorder known as petechiasis. Taylor recovered from the skin rash.

## CONCLUSIONS OF LAW

### (1) Cruel and Unusual Punishment

Both plaintiffs have complained that their confinements in the Hole, maximum security and segregation constituted cruel and unusual punishment under the Eighth Amendment to the Constitution.

The United States Supreme Court has not ruled on the question of what constitutes cruel and unusual punishment under the Eighth Amendment within the context of prison conditions. However, a few broad principles can be gleaned from Supreme Court decisions on the Eighth Amendment in other areas. Within these rather broad outlines, lower courts have occasionally invoked the Eighth Amendment to protect prisoners from inhuman punishments. In most instances disciplinary procedures triggering this judicial reaction have been severe. In order to aid analysis, the relevant cases can be broken into three basic categories.

The first category of consideration is the overall conditions of the prison.

When general conditions in a jail or prison sink to almost barbaric levels, the courts have reacted decisively. The leading case in this area is Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark.1970) aff'd 442 F.2d 304 (8th Cir. 1971). The court noted the following conditions which led to a totality of circumstances in which the Eighth Amendment was violated: (1) the trusty system, which placed power in the hands of favored prisoners rather than paid and trained correctional officers, (2) inadequate supervision and open dormitories, leaving inmates vulnerable to frequent homosexual attacks and stabbing incidents, (3) squalid conditions in isolation cells, (4) the lack of rehabilitative programs, (5) poor sanitary conditions, (6) inadequate clothing, and (7) insufficient medical care. The opinion in *Holt* presents a picture of frightening circumstances under almost impossible conditions. Similar conditions, with the addition of extensive corporal punishments, were declared unconstitutional in Gates v. Collier, 349 F.Supp. 881 (N.D.Miss.1972).

The conditions in the Montana State Prison do not even approximate those found in the penal institutions of Arkansas and Mississippi. Conditions as a whole are not such that confinement in the Montana State Prison constitutes cruel and unusual punishment.

The second category of cases involve the denial of medical care.

Courts have unanimously held that, absent special circumstances, prisoner complaints about denial of medical care through negligence or medical malpractice do not give rise to constitutional claims under the Eighth Amendment. United States ex rel. Hyde v. McGinnis, 429 F.2d 864 (2nd Cir. 1970); Gittle-

macker v. Prasse, 428 F.2d 1, 6 (3rd Cir. 1970). Denial for improper purposes, inmates forced to work even when prison officials know they are ill, or deliberate disregard of an obvious injury or illness, can constitute special circumstances sufficient to elevate a complaint to constitutional status. See Ramsey v. Ciccone, 310 F.Supp. 600, 605 (W.D.Mo. 1970); Woolsey v. Beto, 450 F.2d 321 (5th Cir. 1971); Corby v. Conboy, 457 F.2d 251, 254 (2nd Cir. 1972).

Since Taylor's complaint relating to denial of medical attention does not involve any of these special circumstances, no constitutional deprivation has been established.

The final category to be considered concerns the minimal conditions which must be maintained by prison officials in areas of disciplinary confinement.

■ The courts are in agreement that solitary confinement is not per se cruel and unusual punishment under the Eighth Amendment. Sostre v. McGinnis, 442 F.2d 178, 192 (2nd Cir. 1971); Courtney v. Bishop, 409 F.2d 1185, 1187 (8th Cir. 1969); Ford v. Board of Managers, 407 F.2d 937, 940 (3rd Cir. 1969). However, when the total circumstances under which an inmate is confined become so barbarous as to "shock the conscience", courts have declared such detentions unconstitutional. An important case in which solitary confinement conditions were deemed in violation of the Eighth Amendment is Wright v. McMann, 460 F.2d 126 (2nd Cir. 1972). Trial in the district court established that Wright was confined for two periods, the first of which was 11 days, and the second consisting of 3 weeks. For much of that time he was completely naked. The cell, known as a "strip cell", was barren of all furnishings other than a toilet and wash basin. No bedding was provided, and the temperature was allowed to drop so low at night that inmates were extremely uncomfortable. Eyeglasses were taken, and no soap, towels or toilet paper were provided. The cell was rarely cleaned. Other extreme circumstances accompanying the conditions under which Wright was confined are set out by the court at page 129 of its opinion.

Other decisions ruling solitary confinement unconstitutional recite similarly foul and inhuman conditions. Jordan v. Fitzharris, 257 F.Supp. 674 (N.D. Cal.1966) (naked in 6' x 8' unsanitary "strip cell"); Hancock v. Avery, 301 F.Supp. 786 (M.D.Tenn.1969) (naked in 5' x 8' unsanitary "strip cell"); Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971) (use of bread and water diet, over-crowding and chains in "Meditation" cells condemned).

■ Although the use of the Hole in Montana State Prison is not to be encouraged, I do not think that the conditions prevailing during the time Fife and Taylor were confined were such that they constituted cruel and unusual punishment under the cases cited above. Inmates of the Montana State Prison were not placed in cells naked, nor was there any testimony to the effect that the cells were not cleaned or that temperatures were allowed to drop to uncomfortable levels. Some bedding was provided as well as the most basic items necessary for personal hygiene.

For the reasons above, I conclude that no Eighth Amendment claim is established.

(2) Due Process in Prison Disciplinary Proceedings

Fife and Taylor claim that their constitutional rights were infringed because they were not afforded due process prior to the imposition of disciplinary measures.

The law concerning the due process rights of prison inmates has undergone radical change since the turn of the decade. Recently, however, the United States Supreme Court has quieted the legal debate occasioned by the inconsistent mass of case law by definitively ruling on the question. In Wolff v. McDonnell, —— U.S. ——, 94 S.Ct. 2963, 41 L. Ed.2d 935 (1974), the Supreme Court examined the competing interests of prison

administrators and prison inmates and set forth the due process standards applicable to disciplinary procedures in penal institutions.

■■ The first issue considered by the Court involved inmate McDonnell's demand for the restoration of good time credits lost because of disciplinary confinements allegedly imposed without proper due process safeguards. Relying on Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1972), the court held that this relief was foreclosed. Restoration of good time affects the duration of confinement rather than the conditions of confinement. It is therefore a remedy available only upon the granting of a petition for writ of habeas corpus with the concomitant requirement that all state remedies be exhausted. Although neither Fife nor Taylor sought the restoration of good time by way of their civil rights complaints, each dedicated a great deal of testimony to establish the fact that they were improperly denied the opportunity to earn good time credit during the time they were confined in disciplinary areas. Under Preiser and Wolff, this court cannot consider such testimony as providing a basis for relief in the nature of restoration of good time.

■ In dealing with the difficult question of due process standards behind prison walls, the Supreme Court emphasized the need for a flexible approach which reasonably accommodates the interests of the inmates and the needs of the institution. Accordingly, the Court rejected the concept that inmates are without the benefit of constitutional protections as well as the argument that all due process safeguards insisted upon in procedures outside prison walls are applicable to those taking place within penal institutions. In striking this balance, the Court rejected the more extensive due process safeguards outlined earlier in Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) and Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1972).

"In striking the balance that the Due Process Clause demands, however, we think the major consideration militating against adopting the full range of procedures suggested by Morrissey for alleged parole violators is the very different stake the State has in the structure and content of the prison disciplinary hearing. That the revocation of parole be justified and based on an accurate assessment of the facts is a critical matter to the State as well as the parolee; but the procedures by which it is determined whether the conditions of parole have been breached do not themselves threaten other important state interests, parole officers, the police or witnesses, at least no more so than in the case of the ordinary criminal trial. Prison disciplinary proceedings, on the other hand, take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so. Some are first offenders but many are recidivists who have repeatedly employed illegal and often very violent means to attain their ends. They may have little regard for the safety of others or their property or for the rules designed to provide an orderly and reasonably safe prison life. Although there are very many varieties of prisons with different degrees of security, we must realize that in many of them the inmates are closely supervised and their activities controlled around the clock. Guards and inmates co-exist in direct and intimate contact. Tension between them is unremitting. Frustration, resentment, and despair are common place. Relationships among inmates are varied and complex and perhaps subject to the unwritten code that exhorts inmates not to inform on a fellow prisoner.

"It is against this background that disciplinary proceedings must be structured by prison authorities; and

it is against this background that we must make our constitutional judgments, realizing that we are dealing with the maximum security institution as well as those where security considerations are not so paramount. The reality is that disciplinary hearings and the imposition of disagreeable sanctions necessarily involve confrontations between inmates and authority and between inmates who are being disciplined and those who would charge or furnish evidence against them. Retaliation is much more than a theoretical possibility; and the basic and unavoidable task of providing reasonable personal safety for guards and inmates may be at stake, to say nothing of the impact of disciplinary confrontations and the resulting escalation of personal antagonisms on the important aims of the correctional process." *Wolff,* supra at page —— of —— U.S., at page 2977 of 94 S.Ct.

■ After a full consideration of the competing interests of the inmates and prison administrators, the Court settled on four minimal due process safeguards which must be afforded all inmates accused of activity which might result in serious disciplinary action by prison officials: (1) advance written notice of charges must be given to inmates subject to disciplinary action no less than 24 hours before an appearance before a Disciplinary Committee, (2) inmates are entitled to disciplinary hearings, and they should be allowed to call witnesses and present documentary evidence in their defense if permitting them to do so will not jeopardize institutional safety or correctional goals, (3) written statements by the factfinders as to the evidence relied upon and the reasons for the disciplinary action must be given to inmates after the Disciplinary Committee reaches its conclusion, and (4) the Disciplinary Committee must be sufficiently impartial to satisfy the Due Process Clause. *Wolff,* supra at —— —— of —— U.S., at 2978–2982 of 94 S.Ct. Inmates have no constitutional right to confrontation and cross-examination in prison disciplinary proceedings, nor do they have a right to retained or appointed counsel in such proceedings. Prison officials have the discretion to permit cross-examination when prison disruption does not represent a serious concern. Finally, the Supreme Court urged prison officials to provide substitute counsel in cases involving illiterate inmates or complex issues.

■ Under the guidelines established by *Wolff,* both Fife and Taylor have proved violations of their constitutional rights. Neither was given written notice of charges prior to going before the Disciplinary Committee. Fife's confinement in maximum security from April 11, 1972, to May 15, 1972, and his later confinement in maximum security from July 7, 1972, until the area was closed as a disciplinary area were both without any formal hearing at all. In April of 1972, Taylor spent 11 days in solitary confinement without a hearing. In all disciplinary confinements, neither Fife nor Taylor received a written statement by the factfinders with regard to evidence relied on and reasons for specific disciplinary actions. Finally, I am compelled to find that a Disciplinary Committee which includes as one of its members a correctional officer directly involved in the incidents leading to the disciplinary hearing is not sufficiently impartial to satisfy the Due Process Clause. Sergeant Styron and Sergeant Wyant sat on the Disciplinary Committee before which Earl Taylor was brought on May 16, 1972. Both Sergeants were intricately involved in the incidents leading to Taylor's confinement in the Hole and maximum security, and Sergeant Styron filed the conduct report forming the charges against Taylor. The presence of a charging party on a Board whose duty it is to rationally determine the facts predicating imposition of disciplinary measures constitutes a violation of the due process rights of the inmate subject to such disciplinary measures.

■ Plaintiffs should be granted a declaratory judgment insofar as this opinion indicates that the disciplinary procedures employed at the Montana State Prison violated the Due Process Clause of the Fourteenth Amendment. Plaintiff Taylor is also entitled to an injunction, since he remains incarcerated at the Montana State Prison.

The final question is whether the plaintiffs are entitled to damages. In *Wolff*, the Supreme Court held that the due process requirements outlined in that opinion were not to be applied retroactively. Although the question was approached in the context of whether prison records containing determinations of misconduct should be expunged, it appears that the policy behind the holding is equally applicable to damages. The Court said:

> "The question of retroactivity of new procedural rules affecting inquiries into infractions of prison discipline is effectively foreclosed by this Court's ruling in *Morrissey* that the due process requirements there announced were to be "applicable to *future* revocations of parole," 408 U.S., at 490 [, 92 S.Ct. at 2604] (emphasis supplied). Despite the fact that procedures are related to the integrity of the fact-finding process, in the context of disciplinary proceedings, where less is generally at stake for an individual than at a criminal trial, great weight should be given to the significant impact a retroactivity ruling would have on the administration of all prisons in the country, and the reliance prison officials placed, in good faith, on prior law not requiring such procedures . . . . On the whole, we do not think that error was so pervasive in the system under the old procedures to warrant this cost or result." *Wolff*, supra at —— of —— U.S., at 2983 of 94 S.Ct.

This holding implies that declaratory judgment and injunctions are possible remedies for inmates who did not receive adequate due process safeguards in disciplinary proceedings which took place prior to the decision in *Wolff*, but that the modification of past prison records and damage awards are not proper remedies.

■ The evidence in this case clearly shows that the defendants did not act maliciously or arbitrarily. The law in this area was changing dramatically during the period of time at issue here. It continued to change and develop while this court had the matter under advisement. Efforts of the defendants to conform disciplinary procedures with newly forming law were evident from the testimony of witnesses on both sides. This presents exactly the kind of situation contemplated by the Supreme Court when it ruled against retroactivity in *Wolff*. Liability should not be imposed upon prison officials for acts done in good faith and in conformity with established prison practice at a time prior to the formulation of the due process standards relating to prison discipline. Spurlock v. Crist, Civil No. 2240 (D. of Mont.1974).

Therefore this Court declares that the disciplinary procedures employed by the Montana State Prison violated the Due Process Clause of the Fourteenth Amendment in that they failed to provide for advance written notice of charges against inmates, the right of accused inmates to call witnesses and present documentary evidence when such does not jeopardize institutional safety or correctional goals, written statements of the factfinders as to evidence relied upon and reasons for disciplinary actions, and Disciplinary Committees which are made up of correctional personnel not directly involved in incidents pending before the Committee.

Further, it is ordered and this does order that the defendants are enjoined from further employing disciplinary procedures which are inadequate under this opinion and judgment. The defendants are given 60 days from the date of this order in which to provide the court with a disciplinary procedure

plan which recognizes the new requirements set forth by the United States Supreme Court. The injunction is suspended until said 60 days have elapsed.